UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


THOMAS BLANCHAR,                          )
           Plaintiff,                          )
                          )
      vs.                          )          1:11-cv-00047-RLY-DKL
                          )
STANDARD INSURANCE COMPANY,   )
           Defendant.                          )


**ENTRY ON DEFENDANT STANDARD INSURANCE COMPANY'S MOTION
FOR SUMMARY JUDGMENT AND MOTION TO STRIKE PLAINTIFF'S
SURREPLY TO DEFENDANT'S REPLY**

Defendant, Standard Insurance Company ("Standard"), moves for summary

judgment as to Plaintiff Thomas Blanchar's ("Blanchar") claim that Standard improperly

classified Blanchar as an exempt employee and therefore is obligated to pay Blanchar

overtime wages pursuant to the Fair Labor Standards Act ("FLSA").  Standard contends

that Blanchar, Standard's Special Markets Director, qualifies for both the administrative

and highly compensated employee exemptions under the FLSA; therefore, Blanchar is not

entitled to overtime wages under the FLSA, and Standard is entitled to judgment as a

matter of law.  For the reasons set forth below, the court **GRANTS** Standard's Motion for

Summary Judgment.

Standard also moves to strike Blanchar's Surreply to Standard's Reply Brief on the

grounds that none of the limited purposes for which a party may file a surreply in the

context of a summary judgment motion was present.  Under Local Rule 56.1(d), a

surreply to a motion for summary judgment may only be filed if the moving party in its reply relies upon new evidence or objects to the admissibility of the non-moving party's evidence. Furthermore, the surreply must be limited to the new evidence and/or objections. S.D.Ind.L.R. 56.1(d). Blanchar asserts that the Surreply is a necessary response to Standard's request that the court disregard portions of Blanchar's affidavit that Standard considered to be inconsistent with Blanchar's prior deposition testimony, which Blanchar equates to an objection to the admissibility of his evidence. Standard claims neither to have relied upon new evidence in its Reply Brief nor objected to the admissibility of Blanchar's evidence, noting that it merely addressed its objection to Blanchar's inconsistent testimony in a footnote of its Reply. It is well settled that the court may exercise its discretion and disregard affidavits in conflict with prior sworn testimony. *See Holman v. Revere Elec. Supply Co.*, 154 Fed.Appx. 501, 504 (7th Cir. 2005). The court is capable of determining whether such a conflict in testimony exists and may strike conflicting portions of an affidavit with or without a party's request. Even though such determinations are within the court's discretion, the court will allow Blanchar's Surreply to the extent that it responds to Standard's objection to portions of Blanchar's affidavit. However, only the first five paragraphs address Standard's alleged objection to the admissibility of Blanchar's affidavit. Blanchar uses the remaining four pages of his Surreply to expand his previous arguments. For these reasons, Standard's Motion to Strike is **DENIED in PART** with respect to the first five paragraphs of Blanchar's Surreply and **GRANTED in PART** with respect to the remaining portion of

2

Blanchar's Surreply.

## I.     Facts

In 2005, Standard introduced a new product into the 403(b) and 457 markets.
(Deposition of Thomas Blanchar ("Blanchar Dep.") 6:24-7:6; Affidavit of Tom Blanchar
("Blanchar Aff.") ¶ 5).  A 403(b) is a retirement plan for employees of not-for-profit
organizations and certain governmental entities, similar to 401(k) plans in the for-profit
sector, and a 457 plan is a deferred compensation plan.  (*Id.* ¶¶ 5-6).  That same year,
Standard hired Blanchar as the Director of National Accounts/Product Manager of its
403(b) and 457 products.  (*Id.* ¶ 4).  Prior to 2008, Blanchar's title changed to Special
Markets Director for the Retirement Plans business unit.  (Affidavit of Robert
Baumgarten ("Baumgarten Aff.") ¶ 3).  Standard's Retirement Plans business unit sells
retirement products primarily to employers for use in employee benefits packages.  (*Id.* ¶
2).

### A.     Blanchar's Duties

Initially, Blanchar's duties were to train the sales staff on the 403(b) market and its
differences from the 401(k) market, to offer his experience in the field, to do what needed
to be done to make the new product competitive in the marketplace, and to make
suggestions on how to enhance the product.  (Blanchar Dep. 7:7-8:8).  Standard provided
Blanchar with sales training.  (Deposition of Robert Baumgarten ("Baumgarten Dep.")
75:2-20).  He did not perform any manual labor.  (Blanchar Dep. 91:13-14).

Blanchar worked from home, was the only product manager for the 403(b)

3

product, and felt "kind of isolated."  (*Id.* 66:14-16; 67:2-4; 126:12-13).  During his

employment with Standard, his supervision went from "almost zero" to "more regular

conversations with Robert Baumgarten ("Baumgarten"), Blanchar's supervisor from

2007-2010; however, he and Baumgarten only met once a year, unless they happened to

meet at a regional office they both were visiting.  (*Id.* 71:16-21; 126:4-6; 127:4-9).

     When Blanchar began reporting to Baumgarten in 2007, his job description was

revised.  (*Id.* 79:3-8; Blanchar Dep. Ex. 2).  In the Job Summary, the stated purpose of the

Special Markets Director was to use "knowledge of special products and regulations . . .

to support the sales team in marketing and selling" and the Special Markets Director was

"[r]esponsible for managing the work environment, identifying workforce needs and

ensuring alignment with corporate manager expectations, values and vision."  (Blanchar

Dep. Ex. 2).  His top two principal duties and responsibilities included working with the

sales teams to develop and implement successful sales strategies and to monitor ongoing

performance, and partnering with the sales team to provide consulting and guidance to

channel partners and clients about special markets plans, including competitive analysis,

marketplace research, and identifying new business opportunities.  (*Id.*).  In time,

according to Blanchar, the latter became his principal duty.  (Blanchar Dep. 79:9-13).

Standard agrees that Blanchar's efforts were designed to promote the sale of special

markets retirement plans.  (Baumgarten Dep. 132:19-23; 157:13-158:8).

     On his 2009 Self-Appraisal Form, Blanchar considered his top accomplishments to

be Standard's substantial increase in 403(b) sales; the establishment of Standard as a

provider in the marketplace; an increase in Standard's name recognition in the

marketplace due to his webcasts, participation in conferences, and numerous live and

telephonic advisor meetings; and his training and support of salespeople.  (Baumgarten

Dep. Ex. 4).  In 2008, his goal was to work with salespeople to generate at least fifty (50)

special markets cases.  (*Id.* Ex. 5).  Baumgarten listed Blanchar's primary objective as

sales in Blanchar's 2009 Performance Appraisal; however, Baumgarten also referred to

Blanchar as Standard's product manager and expert on Special Markets and listed

Blanchar's key goals as growing the Special Markets case counts by twenty percent,

representing Standard in the Special Markets marketplace, and representing the

marketplace internally to Standard.  (*Id.* Ex. 3).  Baumgarten never told Blanchar that

sales was not Blanchar's primary objective.  (Baumgarten Dep. 27:18-28:7).  Baumgarten

also noted that Blanchar's "focus on sales made a big difference in the 2009 results."

(*Id.*).  Scott Hibbs, Vice President of Standard's asset management group, referred to

Blanchar as a salesman in an email to a human resources employee, albeit after the filing

of this lawsuit, which was the subject of the email.  (Plaintiff's Ex. 12 ("Hibbs Email")).

According to Blanchar, salespeople would call him daily with new opportunities

and would ask him for advice as to what to say and do when giving presentations, the best

way to sell a product, and what would work with a particular customer.  (Blanchar Dep.

79:15-19; 81:6-9).  Blanchar trained salespeople on the differences between 403(b) and

401(k) plans.  (*Id.* 62:11-23).  As the 403(b) expert, he attended lunches with salespeople

who wanted to get into the 403(b) market, but did not know how to do it, where the

clients were, or what to say.  (*Id.* 81:19-82:10).  Baumgarten also referred to Blanchar as the in-house expert and consultant on special markets plans who would engage with the broker in sales-oriented conversations where appropriate at the salesperson's request. (Baumgarten Dep. 60:4-19).  For each plan actually sold in a year, Blanchar promoted roughly five prospective plans either by accompanying a salesperson to a presentation or assembling the written materials a salesperson would need for a presentation, which were his regular activities week in and week out during the last three years of his employment. (Blanchar Aff. ¶¶ 18-20, 31).

The number one question Blanchar received from salespeople was whether a customer could roll a 403(b) into a 401(k).  (Blanchar Dep. 80:12-20).  At times, a broker would ask a salesperson if the broker could add a Roth component to the plan, which the sales person forwarded to a manager, who forwarded the question to Baumgarten.  (*Id.* 113).  Baumgarten would then ask Blanchar for the answer.  (*Id.*).  Blanchar was seen as the answer person for such questions.  (*Id.* 113:25-114-3).  Blanchar had influence over newer salespeople, including how to train them, walking them through the process of making a proposal, and what does and does not work when making proposals.  (*Id.* 141:16-24).

In addition to advising salespeople over the phone, Blanchar traveled to meet salespeople so that he could be physically present to make presentations with them.  (*Id.* 87:4-6).  Blanchar had individual expertise and twenty-five years of experience in this industry, which he marketed when giving presentations.  (*Id.* 141:4-15).  Blanchar also

made presentations to brokers at conferences and seminars. (*Id.* 87:7-9). He would

choose one of three different presentations designed by him that were approved by the

legal and marketing departments, and a question and answer session followed each

presentation. (*Id.* 88:7-15). Blanchar answered the questions based on his knowledge

and experience. (*Id.* 88:13-19).[1] Other times, he hosted webinars for up to 850

participants rather than give a presentation in person, again using presentations he

designed with approval from the legal and administrative departments. (*Id.* 88:23-90:22).

Although Blanchar accompanied salespeople while they made presentations to

their customers, he was not responsible for monitoring their performance or reporting on

their performance to their managers. (*Id.* 95:16-21). Additionally, Blanchar had no

responsibility for monitoring the administration of retirement plans. (*Id.* 95:22-24).

Standard acknowledges that Blanchar did not generate sales reports or the data fields for

those reports; determine the content of special markets reports generated by the company;

structure formulas used to calculate revenue, expenses, or projections for individual

---

[1]The court may disregard any statements in Blanchar's affidavit that are inconsistent with his prior sworn testimony. *See Holman v. Revere Elec. Supply Co.*, 154 Fed.Appx. 501, 504 (7th Cir. 2005) ("affidavits in conflict with prior sworn testimony should be disregarded"). In the Surreply, Blanchar fails to address properly Standard's assertion that Blanchar's affidavit conflicts with his prior deposition testimony. Instead, Blanchar argues that because Standard did not specify in the footnote of its Reply which parts of Blanchar's deposition were in conflict with his subsequent affidavit, no conflict exists. While Standard may not have specified the deposition testimony to which it was referring in the footnote, Standard was clearly referring to the cited deposition testimony which corresponds with the sentence to which the footnote is attached. (Reply 3 n.1). Without more, Blanchar's Surreply fails to dispel or explain the conflicting testimony. Blanchar's assertion in his affidavit that he never deviated from either Standard's express guidelines or manuals on the IRS website when responding to salespeople's or others' inquiries contradicts his prior deposition testimony cited above to the extent that he is claiming not to have relied on his own knowledge and experience; therefore, the court disregards the portions of Blanchar's affidavit in conflict with his deposition testimony. (*See* Blanchar Aff. ¶ 53).

prospective clients; or determine actuarial/underwriting variables.  (Baumgarten Dep.

128:12-20, 135:21-136:8, 123:7-124:3, Ex. 51; Blanchar Aff. ¶¶ 8, 10-11).

Blanchar also advised his superiors on potential business opportunities.  (Blanchar

Dep. 120-123).  Baumgarten relied on Blanchar's advice and guidance concerning

Standard's special markets products and potential business opportunities, even referring

to Blanchar as the "gatekeeper" for Standard's 403(b) business.  (Baumgarten Aff. ¶ 7).

Baumgarten asked Blanchar his thoughts, whether the opportunity made sense, whether it

was advisable for Standard to do it, and whether the opportunity was worth Standard's

time.  (Blanchar Dep. 115:17-23; 121:5-10).  Baumgarten wanted Blanchar to look at any

"exception requests" related to 403(b) and 457 retirement plans.  (*Id.* 123:19-124:19;

Baumgarten Aff. ¶ 7).  On the other hand, Blanchar had no decision-making role in

deciding which types of plans Standard offered, which plans to discontinue, or whether to

treat each proposed plan as an exception.  (Baumgarten Dep. 62:14-64:12, 104:23-105:19;

Blanchar Aff. ¶¶ 33, 35, 36-38).  Although Baumgarten stated that Blanchar had no

decision-making authority in terms of Standard's internal operations, Baumgarten

admitted that Standard typically followed Blanchar's recommendations regarding whether

or not to pursue a potential business opportunity.  (Baumgarten Aff. ¶ 8; Baumgarten

Dep. 156:24-157:12).

### B.    Blanchar's Compensation

Blanchar earned a base salary with the opportunity to earn additional incentive

compensation.  (Baumgarten Aff. ¶ 4).  His base salary was $102,000 in 2007 and

8

increased each year, reaching $114,173.96 in 2010.  (*Id.*).  The incentive-based portion of Blanchar's compensation depended on the total number of 403(b) and 457 cases sold by Standard's salespeople during the year and the margin excess of those sales.  (*Id.*).  Thus, Blanchar's receipt of incentive compensation did not relate solely to his performance. (*Id.*).  The margin excess is the difference between the expected revenue from a 403(b) plan and the cost of set up and administration of that plan.  (*Id.*).  If the margin excess in one year was at least twenty percent higher than the margin excess of the previous year, then Blanchar received a $20,000 bonus, and for any margin excess above twenty percent, Blanchar received ten percent of that margin excess.  (*Id.* ¶ 5).  Additionally, Blanchar received a $14,000 bonus if the total number of 403(b)/457 plans sold increased by twenty percent over the previous year's sales.  (*Id.*).

Based on the margin excess increase on the requisite plans sold during 2008, Blanchar qualified for $33, 910 in incentive compensation in 2009.  (*Id.* ¶ 6).  Instead, Standard reduced Blanchar's and the Pension Manager's incentive compensation by $18,750 due to their decision to commit Standard to an expense that significantly reduced the margin excess of a 403(b)/457 plan sold.  (*Id.*).

## II.    Motion for Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). A fact is material if it is identified by the substantive law as affecting the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue

9

with respect to any such material fact exists where the evidence is such that a jury could return a verdict for the non-moving party.  *Id.*  If the factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).  In deciding whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable inferences in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255.  However, neither the mere existence of an alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts will defeat a motion for summary judgment.  *Id.* at 247; *Matsushita Elec. Indus.*, 475 U.S. at 586; *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

## III.   Discussion

Blanchar claims that he is entitled to overtime compensation for the hours in excess of forty hours per week that he worked during his time at Standard as required by the FLSA.  Standard insists that it is entitled to summary judgment, because Blanchar is exempt from the overtime requirements of the FLSA under the administrative employee exemption and the highly compensated employee exemption.  The court agrees with Standard that Blanchar satisfies the administrative employee exemption.  Accordingly, analysis of the highly compensated employee exemption is not necessary.

The material facts of this case are undisputed.  The parties agree on the duties performed by Blanchar.  Any disagreements relate to whether Blanchar's duties should be

10

classified as administrative or whether he exercised discretion and independent judgment on matters of significance, which are questions of law.  Standard claims that, as Special Markets Director, Blanchar meets the requirements of an administrative employee under the FLSA and is therefore exempt from its overtime requirements.  The employer carries the burden of establishing that an employee is covered by an exemption.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974).  Exemptions are narrowly construed against employers and are "limited to those establishments plainly and unmistakably within their terms and spirit."  *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

Under the FLSA, employees are entitled to overtime compensation for any hours worked in excess of forty hours per week, unless an employee falls within certain exemptions.  29 U.S.C. §§ 207, 213(a).  One such exemption includes any employee employed in a bona fide administrative capacity.  29 U.S.C. 213(a)(1).  The administrative exemption is defined in the regulations as follows:

> (a)    The term "employee employed in a bona fide administrative capacity in section 13(a)(1) of the Act shall mean any employee:
>
>> (1)  Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging, or other facilities;
>>
>> (2)  Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>>
>> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

11

29 C.F.R. § 541.200(a).

The parties do not dispute that Blanchar's compensation exceeds $455 per week; however, Blanchar denies that his primary duty included (A) the performance of work directly related to the management or general business operations of Standard or Standard's customers or (B) the exercise of discretion and independent judgment with respect to matters of significance.

### A.      Work Directly Related to Management or General Business Operations

Blanchar claims that he primarily performed production work, rather than administrative work, and thus does not meet the requirements of the second prong of the administrative exemption test.  In Blanchar's view, his sales and promotional work for Standard was non-exempt, because it was directed toward specific prospective customers, as distinguished from the work of an employee whose duty is to promote an increase of a company's sales generally.  Furthermore, Blanchar argues that he is not exempt, because he performed production work in the sense that he "produced" sales.

Blanchar relies on an opinion published by the Department of Labor in which the Deputy Administrator determined that employees who perform the typical job duties of a mortgage loan officer do not qualify as bona fide administrative employees and therefore are not exempt from the overtime pay requirements of the FLSA; however, this opinion does not apply to the case at hand.  Wage and Hour Division, Administrator's Interpretation No. 2010-1 (Dep't of Labor March 24, 2010).  Blanchar claims that the opinion refers to financial service sector employees generally; however, the opinion

12

clearly states that it relates to employees who perform the typical job duties of a mortgage loan officer, which includes the primary duty of making sales. *Id.* To determine whether an employee's primary duty is to make sales, the opinion considers, *inter alia*, the proportion of earnings directly attributable to sales and whether the employee is labeled a salesman.[2] *Id.* at 2. The opinion also reflects the idea that representatives who sell loans directly to individual customers, one loan at a time, are not exempt, whereas representatives who engage in more than routine selling efforts and focus on promoting and increasing the company's sales generally are exempt. *Id* at 2.

Unlike mortgage loan officers, the majority of Blanchar's earnings were attributable to his base salary. While he was eligible for incentive compensation, the incentive compensation for which he qualified in 2009 ($33,910) represented only thirty percent of his base salary ($110,848.50). Also, Blanchar insinuates that he was considered a salesman, despite his title as Special Markets Director, because one human resources representative referred to him as a salesman in an email; however, such a statement is not conclusive of his primary duty, because the email was sent after the filing of this lawsuit and represents only one person's opinion, whereas several salespeople referred to him as the "403(b)/457 answer man" and the "product expert." (Baumgarten Dep. Ex. 5 at 5, 7). Furthermore, the inquiry at hand focuses on Blanchar's primary duties; therefore, what other employees called him is not material. Although Blanchar

---

[2]The Administrator analyzes the question of whether an employee's primary duty is making sales under the exemption for outside sales employees, not the exemption for administrative employees.

claims that he was a salesman selling to specific customers, the undisputed facts show that his job included not only increasing Standard's Special Markets sales generally by working with multiple sales representatives, but also giving presentations to groups of brokers, and serving as the "guru" of 403(b) and 457 retirement plans.  His duties are vastly different than those of a mortgage loan officer; therefore, the opinion is not comparable to this case.  Looking to the regulations and applicable case law, the court cannot accept Blanchar's view.

To satisfy the second prong, the regulations further provide that "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment," also known as the administrative/production dichotomy.  29 C.F.R. § 541.201(a).  Under the administrative/production dichotomy, production employees are categorized as those who generate "'the very product or service that the employer's business offers to the public.'"  *Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 517 (6th Cir. 2004) (quoting *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997)).  On the other hand, administrative employees engage in "work that is 'ancillary to an employer's principal production activity.'"  *Id.* (quoting *Martin v. Cooper Elec. Supp. Co.*, 940 F.2d 896, 904 (3rd Cir. 1991)).  "Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include . . . determining which financial products best meet the customer's needs and financial circumstances;

14

advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption."  29 C.F.R. § 541.203(b).[3]

In *John Alden*, the First Circuit held that the work of marketing specialists at a life insurance company is administrative sales promotion work.  *John Alden*, 126 F.3d at 10. The primary duty of the marketing representatives is to work with insurance agents to increase purchases of John Alden insurance products by end-purchasers to whom the agents sell.  *Id.* at 8.  The marketing representatives maintain constant contact with a deck of 500-600 agents, spend seven hours a day on the phone with agents, discuss with agents which products might meet the particular needs of the agent's current or prospective customers, advise agents as to which products to market against competing products, and educate their agents on their products.  *Id.* at 4.  When dealing with agents, the marketing representatives do not use prepared scripts and instead rely on their own knowledge and the specific needs of the agents' customers.  *Id.*  In contrast to agents and the underwriting department, marketing representatives neither negotiate pricing or terms of insurance nor approve or deny applications.  *Id.*  Regarding compensation, marketing representatives receive a base salary with the opportunity to earn incentive compensation based on the

---

[3]Blanchar attempts to cite 29 C.F.R. § 541.503(a-b) as the dispositive rule that employees engaged in promotional activities are non-exempt; however, this section applies to the outside sales exemption, not the administrative exemption.  Because Standard does not claim that Blanchar is exempt as an outside salesperson, 29 C.F.R. § 541.503 is inapplicable.

performance of the agents in their deck.  *Id.* at 5.  For these reasons, the court concluded that the marketing representatives are engaged in something more than routine selling efforts focused simply on particular sales transactions, and that they are promoting sales generally, which constitutes administrative sales promotion rather than production work. *Id.* at 10.

The Seventh Circuit relied on *John Alden* when it recently held that pharmaceutical sales representatives satisfy the second prong of the administrative exemption test.  *Schaefer-LaRose v. Eli Lilly & Co.*, 2012 WL 1592552, at *12 (7th Cir. May 8, 2012).  The pharmaceutical sales representatives are the public face of their employer and whose duty is to promote sales.  *Id.*  They spend the majority of their time preparing for and making sales calls with the goal of influencing physicians' preference for their products.  *Id.* at 2.  Although sales representatives do not have the authority to generate promotional materials, they do select which materials to use for a specific call. *Id.*  While the sales representatives work within the confines of tightly controlled central messages, the calls do not follow a predictable course in that representatives must be able to respond to physicians' individual needs and emphasize certain details.  *Id.* at 3. Accordingly, the court concluded that, like the representatives in *John Alden*, pharmaceutical sales representatives' "primary duty is the performance of work directly related to the general business of the employers, which satisfies the second prong of the administrative exemption."  *Id.* at 12.

Here, Blanchar's duties are strikingly similar to the duties of the employees in

16

*John Alden* and *Schaefer-LaRose*.  Although Blanchar tries to label himself a salesman and claim that he performed the duties of a salesman, the undisputed facts show that Standard employed salespeople, called Pension Consultants, and Blanchar, as Special Markets Director.  Blanchar's duties differed from the duties of Standard's salespeople. Like the employees in *John Alden*, Blanchar's primary duty was to work with salespeople to promote the sales of Standard's financial products, with salespeople responsible for the ultimate sale.  He constantly fielded calls from salespeople, recommended certain marketing materials and plans for certain customers, and educated Standard's salespeople on the Special Markets retirement plans.  Also, Blanchar's compensation included a base salary with the opportunity for incentive compensation that was dependent upon the growth of Standard's sales generally, and not sales to specific customers.  Like the pharmaceutical representatives in *Schaefer-LaRose*, while some of the information he relayed may have come from manuals, his interactions with salespeople and customers were not scripted, and he testified that he used his knowledge and experience when answering salespeople's and brokers' questions.  Also, Blanchar was the creator of the presentations he gave to brokers at conferences.  He was the public face of Standard's Special Markets business unit.  As in *John Alden* and *Schaefer-LaRose*, Blanchar did not negotiate price or approve or deny any customer applications for his products.  Blanchar's duties fall squarely within the holdings of these two cases.  Furthermore, Blanchar was an employee in the financial services industry whose primary duties included determining which retirement plan best meets the customer's needs and financial circumstances;

17

advising the customer regarding the advantages and disadvantages of different retirement plans; and marketing and promoting the employer's financial products, which qualifies him for an administrative exemption under Section 541.203(b).  Standard's Pension Consultants constituted its sales force, and Blanchar's work was ancillary to their work.  Accordingly, under these cases and the regulations, Blanchar's duties satisfy the second prong of the administrative exemption.

**B.    Exercise of Discretion and Independent Judgment with Respect to Matters of Significance**

Blanchar contends he does not meet the requirements of the third prong of the administrative exemption, because Baumgarten fully acknowledged that Blanchar had no discretionary decision-making authority on matters of substance.  Baumgarten admitted that Blanchar had neither input into Standard's decision to discontinue offering a variable annuity or 403(b) plans with multiple vendors nor decision-making authority with regard to discretionary decisions or assessments of internal efficiency.  Also, beginning in late 2009, every potential 403(b) plan was to be treated as an exception and required approval by Baumgarten, not Blanchar.  Furthermore, Blanchar was never included in meetings at Standard's headquarters regarding decision-making for the 403(b) product line, Blanchar and Baumgarten met infrequently, and Standard did not heed Blanchar's request that the company comply with certain SEC requirements.  The ultimate act that demonstrates Blanchar's lack of decision-making authority, Blanchar claims, is the reduction of his compensation by over $18,000 for committing Standard to the use of a payroll

18

consolidator when promoting a customer to adopt a 403(b) plan, because he did not have the authority to make such a decision. According to Blanchar, he neither customarily nor regularly performed exempt administrative functions, much less possessed discretionary decision-making authority.

To satisfy the third prong of the administrative exemption test, Blanchar's primary duty must include "the exercise of discretion and independent judgment with respect to matters of significance," which involves the "comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. §§ 541.200(a)(3), 541.202(a). Factors to consider include "whether the employee has the authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact . . . to waive or deviate from established policies and procedures without prior approval . . . to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or

19

resolving grievances." *Id.* at § 541.202(b).

Although the phrase "the exercise of discretion and independent judgment" implies that the employee has authority to make an independent, free choice, free from immediate discretion or supervision, employees can still exercise such discretion and judgment despite a review of their decisions or recommendations at a higher level. *Id.* at § 541.202(c). In other words, the phrase does not require that an employee's decisions "have a finality that goes with unlimited authority and a complete absence of review." *Id.* The employee's decisions "may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." *Id.*

In holding that pharmaceutical sales representatives exercise discretion and independent judgment in satisfaction of the third prong of the administrative exemption test, the Seventh Circuit noted the representatives' minimal supervision and authority to tailor messages to individual physicians and respond to the circumstances at hand. *Schaefer-LaRose*, 2012 WL 1592552 at *16. The Court also noted the level of attention given to substantive education, which gave the representatives a thorough understanding of their message and the ability to intelligently engage with physicians. *Id.* Representatives strategically analyzed and managed their territories, and while they kept extensive records through which management monitored their work, such monitoring did not detract from the discretion they exercised during their workday. *Id.* at *17.

20

Importantly, the Court recognized that although the regulations list several factors to consider, an employee does not have to perform each of the functions listed in order to satisfy the third prong. *Id.* Ultimately, the Court concluded that the representatives' job entailed a "great deal of judgment"; therefore, the requirements of the third prong were met. *Id.* at *18.

Like the second prong, the Seventh Circuit in *Schaefer-LaRose* relied on the First Circuit's decision in *John Alden* when determining whether the employees met the requirements of the third prong of the administrative exemption test. In *John Alden*, the Court held that the marketing representatives engaged in work that required the exercise of discretion and independent judgment. *John Alden*, 126 F.3d at 14. The Court reiterated that the employee need not have final decision-making authority with respect to matters of consequence, acknowledging that a reversal by higher level management of an employee's decision does not indicate that the work did not require the exercise of discretion and independent judgment. *Id.* at 13 (citing *Dymond v. U.S. Postal Serv.*, 670 F.2d 93, 96 (8th Cir. 1982)). The marketing representatives' duties that required discretion and independent judgment included reliance on their personal knowledge of an agent's business in tailoring proposals for the agent's end-customers, anticipation of competing products that customers might be considering, and distinguishing their offerings from their competitors' offerings. *Id.* The Court determined that these decisions were made in the course of the representatives' day-to-day business and were of consequence to John Alden's business. *Id.* Despite the plaintiff's insistence that the

21

representatives were making decisions within a given set of parameters by merely

applying sales techniques taught to them by John Alden and emphasizing products and

product features as guided by John Alden, the record showed that the representatives did

not use prepared scripts, statements, or sales pitches, and instead tailored each

conversation with an agent to the needs of the agent's customer base.  *Id.* at 14.  The

Court found the representatives were not simply skilled workers operating within a strict

set of rules, but workers who exercised "significant discretion in their daily contacts with

various agents."  *Id.*

Blanchar's job duties at Standard are strikingly similar to the duties of the

employees in *Schaefer-LaRose* and *John Alden* and fall within the language of the

regulations, leading to the conclusion that Blanchar satisfies the third prong of the

administrative exemption test.  Blanchar highlights a few instances in which he did not

have the authority to make specific decisions; however, his day-to-day activities

demonstrate his ability to exercise discretion and judgment on important matters.

Blanchar's lack of input regarding which plans Standard would offer, Standard's decision

to stop offering certain plans, structuring plans, assessments of internal efficiency as to

retirement plan administration, profitability/efficiency analysis, auditing, underwriting,

and whether to treat plans as an exception is undisputed; however, Blanchar is not

required to exercise discretion and independent judgment on every matter of substance.

In an attempt to bolster his claim that he possessed no discretionary decision-making

authority, Blanchar also uses Baumgarten's statement that, during Blanchar's last three

22

years of employment with Standard, Blanchar decided nothing with regard to internal operations; yet, Baumgarten's statement is conclusory.  Rather, Blanchar's duties and actions determine the extent of his decision-making authority.  As stated above, Blanchar's duties were akin to the duties of the representatives in *Schaefer-LaRose* and *John Alden*, and fall within the regulations promulgated by the Department of Labor regarding the exercise of discretionary and independent judgment; therefore, Blanchar's lack of involvement in other areas of decision-making is not conclusive of any lack of authority.

Also at issue are two occasions in which Standard disagreed with actions taken or recommended by Blanchar.  First, Standard reduced Blanchar's compensation by approximately $18,000 due to the expense incurred by Blanchar's decision to utilize a payroll consolidator when negotiating with a customer.  Second, Standard did not heed Blanchar's advice to come into compliance with SEC requirements concerning prospectus delivery to 403(b) participants at enrollment and/or annually.  Although Blanchar portrays these instances as evidence of his lack of decision-making authority, the regulations make clear that decisions or recommendations may be reviewed at a higher level and that revision or reversal of the decision after review does not mean that the employee is not exercising discretion and independent judgment.  *See* 29 C.F.R. § 541.202(c).  Therefore, even though upper management disagreed with Blanchar's decision regarding the payroll consolidator and recommendation regarding SEC compliance, these instances lead to the conclusion that Blanchar did in fact exercise discretion and independent judgment on

23

matters of significance, thus satisfying the third prong of the administrative exemption test.

Despite Blanchar's claims to the contrary, his work entailed the exercise of discretion and independent judgment.  Like the pharmaceutical sales representatives in *Schaefer-LaRose*, Blanchar's supervision was minimal, to say the least.  Blanchar admitted that he felt "kind of isolated" and that his supervision at one point was "almost zero," increasing only to "more regular conversations" with his supervisor in later years. In fact, he and his supervisor only met once a year, unless they could schedule a meeting while traveling to the same city.  Blanchar also strategically managed his interactions with salespeople and did not need approval for his daily decisions regarding which salespeople to work with and when to work with them.  Also, when answering salespeople's questions about Standard's 403(b) and 457 plans and interacting with brokers, Blanchar relied on his own knowledge and experience and did not need approval of his answers from upper management.  Furthermore, even though the content of Blanchar's presentations were approved by other departments, they were created by Blanchar based upon his experience and were tailored for the audience.  Blanchar compared and evaluated possible approaches that he and Standard's salespeople could take either with customers or when creating presentations for customers, and made a decision after considering the various possibilities.  *See* 29 C.F.R. § 541.202(a).  He had the authority to formulate presentations, answer questions as the expert on special markets retirement plans, and guide and assist salespeople with sales calls.  *See* 29 C.F.R.

§ 541.202(b).  He managed his days and interactions with salespeople with virtually no supervision.  *See id.*  Notably, higher level management sought advice from Blanchar on his areas of expertise.  *See id.*  Under not only the regulations but also relevant case law, Blanchar's duties demonstrate the exercise of discretion and independent judgment.

In addition, Blanchar's duties involved matters of significance.  From the time Blanchar joined Standard until the time he left, Standard's sales of special markets retirement plans increased substantially.  Standard noted that Blanchar made a big difference in its 2009 sales, indicating that the decisions he was making and his interaction with the sales force were having a significant impact on Standard's business operations.  Blanchar's education of the sales force not only on the products, but also sales and promotional techniques, increased their effectiveness, which in turn led to substantial growth in Standard's special markets business.  In short, Blanchar performed work that affected Standard's business operations to a substantial degree, even though his assignments were related to the operation of the special markets plans in particular.  *See id.*

When taken in the light most favorable to Blanchar, the undisputed material facts show that Standard is entitled to judgment as a matter of law.  Under the regulations and relevant case law, Blanchar's work during the last three years of his employment with Standard satisfies the administrative exemption test; therefore, he is not entitled to overtime compensation under the FLSA.

**IV.     Conclusion**

For the reasons set forth above, Standard's Motion for Summary Judgment

(Docket # 32) is **GRANTED**.


**SO ORDERED** this 27th day of June 2012.

RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana


Electronic copies to:

James D. Masur II
ROBERT W. YORK & ASSOCIATES
jmasur@york-law.com

Alan L. McLaughlin
LITTLER MENDELSON PC
amclaughlin@littler.com

Brian Lee Mosby
LITTLER MENDELSON, P.C.
bmosby@littler.com

26